483 A.2d 1205 (1984)
In the Matter of A.A.I.
Appeal of DISTRICT of COLUMBIA
No. 83-921.
District of Columbia Court of Appeals.
Argued April 5, 1984.
Decided November 14, 1984.
Richard B. Nettler, Asst. Corp. Counsel, Washington, D.C., with whom Inez Smith Reid, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellant.
Joseph B. Tulman, Washington, D.C., appointed by this court, for appellee A.A.I.
Randy Hertz, Public Defender Service, Washington, D.C., with whom James Klein, Public Defender Service, Washington, D.C., was on the brief, for amicus curiae.
Before MACK and TERRY, Associate Judges, and YEAGLEY, Associate Judge, Retired.
YEAGLEY, Associate Judge, Retired:
The issue presented by this appeal is whether the Family Division of the Superior Court (the Division) had jurisdiction to order a particular placement for a delinquent juvenile after the conditions of its original commitment order were not executed by the Department of Human Services *1206 (DHS). Appellant, the District of Columbia, challenges the authority of the Division to order an alternate placement. Since the original placement order was never executed, we uphold the action of the Division and accordingly affirm the second placement order.
On January 12, 1983, a petition was filed in the Family Division charging respondent with second degree burglary, D.C.Code § 22-1801(b) (1981); first degree theft, id. § 22-3811 (1984 Supp.), and receipt of stolen property, id. § 22-3832. Pending resolution of these charges, respondent A.A.I. was detained at the Children's Center (Cedar Knoll).[1] The detention order of January 12 also directed that respondent "be placed at a Youth Shelter House as soon as possible" following a mental examination by the Child Guidance Clinic and the Mental Health Administration. On February 7, 1983, respondent was placed at Lamont Shelter Home and remained there until March 1, 1983, when he absconded from the facility. Seven days later he was returned to custody, and pursuant to a court order of March 8, 1983, was detained at Cedar Knoll.
On March 30, 1983, respondent entered a plea of guilty to two of the three counts. Disposition was scheduled for April 14, 1983. Following a series of continuances, a disposition hearing on the matter of respondent's placement was ultimately held on May 20, 1983. At the hearing, conflicting reports concerning a suitable placement for respondent were submitted to the Division. The Residential Review Committee of DHS urged that respondent be placed at the Cedar Knoll facility permanently. Court-ordered psychiatric and psychological evaluations, however, disagreed and recommended that respondent be placed in a residential treatment facility equipped with psychotherapy and special educational services. Counsel for respondent sought a specific placement at the Martin Pollack Project, a private residential facility in Annapolis, Maryland. In view of the conflicting recommendations, the court continued the disposition hearing until June 10, 1983, and requested respondent's counsel, in the meantime, to locate a facility which was both suited to A.A.I.'s needs and also under contract with DHS.
On May 26, 1983, respondent filed a motion with the Division to order DHS to show cause why the Martin Pollack Project or other similar residential treatment facilities were not suitable placements for respondent. The motion also requested the court to reconsider placing A.A.I. at Martin Pollack. An order to show cause was issued on June 1. On June 2, 1983, respondent absconded for a second time from Cedar Knoll. He was apprehended and returned to the facility in accordance with a court order on June 9, 1983.
The hearing to consider respondent's placement, held on May 20, but continued without decision, was resumed on June 10, 1983. At the hearing respondent's counsel reiterated his request for placement at Martin Pollack. He nevertheless conceded that the Community Advocates for Youth Foster Home (CAY) or the Youth Advocates Program (YAP) would be appropriate placement alternatives for respondent. Both facilities were under contract with DHS. Nevertheless, the Assistant Corporation *1207 Counsel rejected defense counsel's suggestions and again urged the Division to order A.A.I. permanently placed at Cedar Knoll.
In making its decision, the Division expressed some concern over the proposed closing of Cedar Knoll and concluded that it would be in respondent's best interests if he were placed in a facility which could provide a consistent, uninterrupted program of care. Furthermore, the court found that respondent was in need of special services which were unavailable at Cedar Knoll. Accordingly, by order of June 10, 1983, the Division adjudged respondent to be in need of residential treatment. The order specifically stated that Cedar Knoll was not an appropriate placement for him. The order committed respondent to the custody of DHS and also issued the following directives to the agency: (1) place respondent in the CAY Foster Home, (2) provide him with psychiatric and special educational services, and (3) consider the Youth Advocate Program as an alternative placement facility. DHS was further ordered to file a report within thirty days concerning the execution of the conditions of the June 10 order. See Super.Ct.Juv.R. 32(h). Finally, included as part of the commitment order, the court directed that "respondent shall be placed only by order of the Division." In entering this particular condition of the order, the Division stated:
I'm going to modify item two of the standard order of the release into aftercare and it seems to be more appropriate for me to say that respondent should be placed by order of Court, the Court having made a specific placement, no alternative placement should be made except by order of the Court. (Emphasis added.)
An examination of the record reveals that DHS, for no apparent reason, never executed the directives of the June 10 order. Despite the court's specific finding that Cedar Knoll was an inappropriate placement for respondent, A.A.I. unexplainedly remained at that facility for almost thirty days after the disposition order was issued. During this period, respondent never received any of the special educational or psychiatric services ordered by the court. The thirty-day report on A.A. I.'s progress was never filed with the Division. Almost one month after the court's order was entered, A.A.I. absconded from Cedar Knoll on July 5, 1983.
Respondent was located several days later at Howard University Hospital recovering from an overdose of sleeping pills. Following his apparent suicide attempt, respondent was ordered by the court to be placed at the Receiving Home until July 21, 1983. Pursuant to a court order of July 2, A.A.I. underwent a 21-day mental evaluation and clinical observation at St. Elizabeths Hospital. He was examined by staff members of the Bureau of Forensic Psychiatry of DHS. The Bureau's report revealed that respondent:
[C]ontinues to be in need of psychiatric hospitalization for further evaluation and the institution of treatment for his depression. An aspect of this treatment needs to be formulating and implementing a program designed to meet his long term needs. I recommend that [respondent] not be returned to the Children's Center [Cedar Knoll]. (Emphasis added.)
Respondent was also evaluated by the Director of Child and Adolescent Services of St. Elizabeths. In his report dated August 10, 1983, the Director confirmed that respondent possessed severe learning disabilities. He believed that respondent's ingestion of sleeping pills was a direct result of his return to Cedar Knoll. He emphasized A.A.I.'s need for special educational and psychiatric services, and strongly urged that respondent not be returned to Cedar Knoll.
While A.A.I. was undergoing evaluation at St. Elizabeths, the Foster Care Coordinator of CAY, on August 10, 1983, informed counsel for respondent that due to respondent's assaultive behavior, he could not be admitted to the facility. The letter, however, *1208 also advised against placing A.A.I. at Cedar Knoll.
In light of respondent's rejection by CAY, the Division conducted an intermediate review of the commitment order on August 12, 1983. At the hearing, counsel for A.A.I. once more sought placement at the Martin Pollack Project. Counsel appearing for DHS announced that he was not familiar with respondent's case and requested a continuance. The Division granted a one-week continuance to allow DHS to seek appropriate alternative placements for A.A.I. Pending an order of permanent commitment, respondent was ordered temporarily placed at the Receiving Home until August 17, 1983.
On August 17, 1983, the Division was informed by respondent's counsel that DHS still had taken no steps toward effecting the June 10 disposition order. Counsel for the government insisted in placing respondent at Cedar Knoll or some other DHS group home. The Division, finding that A.A.I. was not receiving the appropriate court-ordered rehabilitative services, and that DHS had not found any substitute placements, and in light of CAY's refusal to accept respondent, ordered that respondent be placed forthwith at the Martin Pollack Project. The District appealed the order and won an emergency stay of placement. On September 2, 1983, the stay was vacated and respondent was placed at the Martin Pollack Project.
The District now complains that the Division was without authority to issue the second disposition order of August 17, 1983, placing respondent in the Martin Pollack Project. It is undisputed that the Family Division of the Superior Court is empowered to designate a particular placement for juveniles as part of its disposition order. D.C.Code § 16-2320(c)(1) (1981); id. § 16-2320(a)(5) (1981); In re J.A.G., 443 A.2d 13, 15 (D.C.1982); In re J.J., 431 A.2d 587, 591 (D.C.1981). The District argues that by virtue of issuing the initial disposition order of June 10, the Division surrendered jurisdiction over respondent and exclusive supervisory responsibility vested in DHS. We disagree. Only when the disposition order is issued and is implemented by DHS does the Division relinquish its authority to make a new disposition, and DHS can assume exclusive supervisory responsibility over the juvenile. See In re J.M.W., 411 A.2d 345, 349 (D.C.1980). By issuing the order, only interim custody of respondent transfers to DHS. Exclusive custody will vest in DHS only upon the execution of the conditions of the order.[2]
If DHS were to prevail here, the Family Division's statutory authority to designate particular placements, D.C.Code § 16-2320(c)(1) (1981); id. § 16-2320(a)(5), would be rendered meaningless since the Division's disposition scheme could be thwarted by the mere inaction of the agency. Thus, unless the court possesses some concomitant follow-up authority to assure the execution of its order, DHS could ignore the terms of the Division's order and implement its own rehabilitative program.
In the instant case, the initial disposition order was issued by the Division on June 10, 1983, but the conditions of that order were never executed by DHS. The order specifically provided that "Cedar Knoll was not an appropriate placement for him [respondent]," and yet for almost thirty days after the order was issued, DHS failed to remove respondent from that facility. Apparently, A.A.I. would have remained at Cedar Knoll indefinitely had he not absconded on July 5, 1983.
*1209 Furthermore, DHS was also ordered to consider the Youth Advocate Program as an alternative placement facility. Evidently DHS also disregarded this directive. When CAY Foster Homes rejected respondent, DHS sought placement only at Cedar Knoll. DHS never even attempted to place respondent with the Youth Advocates Program. Moreover, our review of the record indicates that almost three months had elapsed between the issuance of the original commitment order (June 10, 1983) and respondent's final placement in a suitable rehabilitative facility (September 2, 1983). In the interim, DHS ignored the detailed directives of the Division's order and detained respondent at Cedar Knoll in complete disregard of what the Division found were his best interests. In light of the agency's utter failure to implement the conditions of the June 10 disposition order, we hold that exclusive custody had not yet vested with DHS and the Division retained authority to issue the second commitment order placing respondent at the Martin Pollack Project.
This appeal also challenges that part of the June 10 commitment order in which the Division directed that "respondent shall be placed only by order of the Division." The District argues that the issuance of a commitment order automatically transfers custody to DHS, and that the Division's attempt to retain continuing authority to order subsequent placement for A.A.I. is contrary to a recent line of decisions of this court. See In re J.A.G., supra, 443 A.2d at 13; In re J.J., supra, 431 A.2d at 587; In re J.M.W., supra, 411 A.2d at 345. A careful reading of those decisions, however, reveals that appellant's reliance upon them is misplaced. These decisions all involved situations where only after placement was effected in accordance with the Division's order did the court attempt to intervene to reassert its authority. See In re J.A.G., supra, (where subsequent to a period of aftercare treatment, the court ordered respondent placed in a new residential program as the third phase of respondent's treatment); In re J.M.W., supra, (where the court attempted to revoke the aftercare status of a juvenile who had been committed to the custody of DHS without any court-ordered conditions or other restrictions upon the discretion of DHS). Those situations differ significantly from the case at bar where DHS did not even begin to execute the placement scheme formulated by the Division.
We share, to some extent, the concerns expressed by the District that it is generally undesirable for the judiciary to intervene in matters relegated to the expertise of the various parts of the executive branch. Indeed, in some juvenile cases the degree of judicial involvement could be minimal. However, this deference is not warranted, or practical, where DHS has simply failed to carry out the order of the Division.
In light of the overriding goal of the District's Juvenile Act to promote the care and rehabilitation of the juvenile, In re C.W.M., 407 A.2d 617, 620 (D.C.1979), the court must be empowered to act and/or issue an alternative commitment order when DHS fails to comply with the original order of the Division. See D.C.Code § 16-2324(a)(3) (1981).
Accordingly, the August 17, 1983, commitment order of the Family Division is
Affirmed.
TERRY, Associate Judge, concurring:
I join in the opinion of the court. I write separately, however, to stress that our decision today is a very narrow one, confined to the facts of this case. In particular, the validity of the trial court's direction in its June 10 order that "respondent shall be placed only by order of the [court]" depends on the fact that DHS did not even attempt to execute the other provisions of that order. Whether any trial court has the power, as a general proposition, to include such a provision in a commitment order is  to me, at least  still an open question.
NOTES
[1] Respondent's whereabouts, pending the disposition of this case, may be chronicled as follows:

January 12, 1983  Petition filed
January 12-February 7, 1983  At Cedar Knoll
February 7-March 1, 1983  At Lamont Shelter Home
March 1-8, 1983  In abscondence from Shelter Home
March 8-June 1, 1983  At Cedar Knoll
June 2-9, 1983  In abscondence part time; in Howard University Hospital recovering from suicide attempt
June 9-July 5, 1983  At Cedar Knoll
June 10, 1983  Court Order of Commitment to CAY Foster Home (not complied with)
July 5, 1983  In abscondence from Cedar Knoll
July 15-20, 1983  At Receiving Home
July 20-August 12, 1983  St. Elizabeths Hospital
August 12-17, 1983  At Receiving Home
August 17, 1983  Ordered placed at Martin Pollack Project
[2] We emphasize that here, in addition to the disposition order for DHS to place respondent at the CAY Foster Home, the court made special findings: (1) that Cedar Knoll was not an appropriate placement for this respondent; (2) DHS should provide him with psychiatric and special educational services; and (3) consider the Youth Advocate Program as an alternative placement facility. Finally, it ordered DHS to file a report within thirty (30) days concerning the execution of the June 10th order. We do not find in the record that any of these findings or orders were complied with.